1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

11

12

13

14

15

| | |
|---|---|
| DOROTHY TRUEBLOOD, | CASE NO. C23-0269JLR |
| Plaintiff, | ORDER |
| v. | |
| VALLEY CITIES COUNSELING AND CONSULTATION, et al., | |
| Defendants. | |

### I.   INTRODUCTION

16

17

18

19

20

21

22

Before the court are (1) Plaintiff Dorothy Trueblood's motion for partial summary judgment, and (2) Defendant Valley Cities Counseling and Consultation's ("VCCC") motion for summary judgment.  (Pl. MSJ (Dkt. # 16); Def. MSJ (Dkt. # 19); *see also* Pl. Reply (Dkt. # 28); Def. Reply (Dkt. # 26).)  Each party opposes the other's motion.  (Pl.

//

//

Resp. (Dkt. # 24)[1]; Def. Resp. (Dkt. # 22).)  The court has considered the motions, the parties' submissions in support of and in opposition to the motions, the relevant portions of the record, and the governing law.  Being fully advised,[2] the court DENIES Ms. Trueblood's motion for partial summary judgment and GRANTS VCCC's motion for summary judgment.

## II.  BACKGROUND

This case arises out of Ms. Trueblood's employment at VCCC, a nonprofit counseling and treatment center that serves vulnerable members of the community— including transgender youth.  In 2022, Ms. Trueblood's religious convictions prompted her to request workplace accommodations related to the use of preferred pronouns.[3] VCCC terminated Ms. Trueblood's employment after determining that some of her requests would have posed an undue hardship upon VCCC's particular business, and this lawsuit followed.  Below, the court sets forth the relevant factual and procedural history before turning to the merits.

---

[1]  Ms. Trueblood filed her opposition brief one day beyond the July 19, 2024 deadline. *See* Local Rules W.D. Wash. LCR 7(d)(4) (requiring summary judgment responses to "be filed and received by the moving party no later than 21 days after the filing date of the motion"). Nevertheless, the court exercises its discretion to consider Ms. Trueblood's untimely response brief.  *See, e.g.*, *Protigent, Inc. v. Gustafson-Feis*, No. C20-1551KKE, 2023 WL 8089169, at *1 (W.D. Wash. Nov. 21, 2023) ("It is within the [c]ourt's discretion to consider an untimely response.").

[2]  Both parties request oral argument (Pl. MSJ at 1; Def. MSJ at 1), but the court determines that oral argument would not aid in its disposition of the motions, *see* Local Rules W.D. Wash. LCR 7(b)(4).

[3]  The term "preferred" is consistent with the parties' briefing and the record in this case. The court does not intend to imply that any transgender individual's pronouns are merely suggested, optional, or anything less than inherent to one's identity.

**A.    The Parties**

Ms. Trueblood is a Christian woman who worked at VCCC for just over a decade, from early 2012 to mid-2022.  (*See* 1st Morse Decl. (Dkt. # 20) ¶ 2, Ex. 1 ("Pl. Dep.") at 164:12-15; Tribbett Decl. (Dkt. # 18)[4] ¶ 3, Ex. 1 ("Personnel Files") at 336-37; Tribbett Decl. ¶ 13, Ex. 18 ("Termination Letter") at 500.)

VCCC is a 501(c)(3) nonprofit behavioral healthcare provider that operates 12 clinic locations throughout King and Pierce County.  (Henson Decl. (Dkt. # 21) ¶ 2; *see also* Tribbett Decl. ¶ 4, Ex. 9 ("Manual") at 403 (identifying VCCC's "vision" as "providing integrated, quality and recovery-oriented behavioral health services to achieve healthy and compassionate communities").)  VCCC provides "a wide spectrum of health services,"

> including but not limited to:  mental health services (for example, depression anxiety, bipolar disorder, and gender dysphoria); psychiatric care services; substance use care services (inpatient and residential); . . . medication assisted services (to assist those with opioid addiction to access medication to help treat their condition); a mobile clinic that provides behavioral health services to those in rural communities in King County; and assistance to veterans with physical and psychological challenges.

(Henson Decl. ¶ 3.)  In addition, VCCC "provides outreach services to homes, schools, jails, hospitals, people living on the streets, shelters, nursing homes, and other community spaces."  (*Id.*)  VCCC "is open to all members of the community," and individuals can obtain its services by "walk[ing] into any of its 12 locations" or by calling its 24-hour crisis hotline.  (*Id.*)

---

[4] The court refers to the pages numbers in the CM/ECF header when citing to this declaration and the exhibits attached to it.

1    In partnership with the Washington State Health Care Authority, VCCC also

2    operates a Wraparound with Intensive Services ("WISe") Program.  (*Id.* ¶ 4.)  The WISe

3    Program is a youth-oriented approach for helping children and their families with

4    intensive mental healthcare in both home and community settings based on

5    individualized need.  (*Id.*)  WISe is available to youth aged 20 or younger who are

6    eligible for coverage under Washington Apple Health and meet certain medical necessity

7    criteria.[5]  (*Id.*)  Youth clients in the WISe Program "have intensive and complex

8    behavioral health issues," some of which "relate to sexual orientation and gender

9    identity."  (*Id.* ¶ 12.)  For example, "[s]ometimes the youth is experiencing distress

10   because their parent is unwilling to recognize their gender identity or refuses to use their

11   preferred pronouns," which "can be extremely harmful to the client."  (*Id.*)

12       New youth clients enter the WISe Program by completing an intake process with a

13   mental health professional and a peer counselor and/or parent partner.  (*See* 1st Morse

14   Decl. ¶ 4, Ex. 3 ("Blenz Dep.") at 70:3-10.)  "Peer counselors provide assistance and

15   support to the youth," offering guidance "based on the peer counselor's own life

16   experiences utilizing behavioral health services."  (Henson Decl. ¶ 5.)  Parent partners

17   draw "from their own experience to navigate systems and assist clients and their

18   families," meeting with the youth, their parents, and other community partners as needed.

19   (*Id.*)  In general, parent partners are assigned to cases based on employee capacity at the

20   //

21

22   [5]  Washington Apple Health "is Washington['s] version of Medicaid for low income
individuals and families."  (Henson Decl. ¶ 4.)  *See generally* WAC 182-505-0210.

ORDER - 4

1   time of intake.  (Blenz Dep. at 31:4-6.)  At all times, the client remains the youth—not

2   the parent.  (Henson Decl. ¶ 6; Pl. Dep. 13:6-18.)

3          VCCC maintains several internal policies that govern its services and workplace.

4   (Henson Decl. ¶¶ 7-9.)  Its Compliance and Ethics Policy requires "deliver[y] of services

5   in an accessible and non-discriminatory manner" that "meet[s] the needs of clients of

6   differing:  gender, race, religion, color, national origin, . . . veteran status, sexual

7   orientation, age, marital status, ancestry, [and] political ideology," among other protected

8   characteristics.  (*Id.* ¶ 7, Ex. A ("C&E Policy") at 1.)  VCCC's Cultural Competence

9   Standards guide the service of clients from diverse backgrounds, requiring those services

10  to "be culturally competent and individualized to best meet [clients'] own personal

11  mental health needs."  (*Id.* ¶ 8, Ex. B ("CCS Policy") at 1.)  "Care plans shall coordinate

12  mental health needs of the individual within the client's defined family (where

13  appropriate and with [the] client's consent)."  (CCS Policy at 1.)  VCCC also maintains a

14  policy that requires employee email signatures to follow a standard template, but that

15  designates personal pronouns as "[o]ptional email signature additions."  (Tribbett Decl.

16  ¶ 4, Ex. 5 at 382.)  VCCC's Staff Principles require employees to "[d]emonstrate a

17  commitment to [VCCC's] mission, values, goals, principles, procedures and strategic

18  plan"; "[d]emonstrate a working understanding of and adherence to [VCCC] policies and

19  procedures"; "[r]espect client needs and preferences"; "[d]emonstrate collegiality,

20  flexibility, and respect for all co-workers"; and "[e]nsure staff feel empowered, [and]

21  respected."  (Henson Decl. ¶ 9, Ex. C ("Staff Principles").)

22  //

1    VCCC hired Ms. Trueblood as a WISe Program parent partner on January 23,

2  2012.  (Personnel Files at 336-37; *see also* Pl. Dep. at 13:19-23.)  Upon hire, Ms.

3  Trueblood received and signed a copy of VCCC's Staff Principles, acknowledging they

4  would govern her work and conduct at VCCC.  (Staff Principles; Pl. Dep. at

5  14:16-15:25.)  Over time, Ms. Trueblood received generally positive performance

6  reviews that indicated she was consistently meeting VCCC's expectations overall.  (*See*

7  Personnel Files at 4-76.)  Ms. Trueblood openly expressed her Christian faith at VCCC

8  and felt that VCCC treated her faith inclusively throughout her tenure there—until she

9  was terminated in 2022.  (Pl. Dep. at 182:16-19.)

10    At all relevant times, Ms. Trueblood reported directly to WISe Program Manager

11  Anna Williams.  (*Id.* at 27:3; Blenz Dep. at 9:24-10:2.)  Ms. Trueblood sometimes

12  interacted with Dallas Blenz, another WISe Program Manager who led a different team of

13  peer counselors and parent partners that did not include Ms. Trueblood.  (Blenz Dep. at

14  6:24-7:5, 9:10-23; *see also id.* at 11:13-23.)  Mr. Blenz and Ms. Williams both reported to

15  Sarah Boye, Director of Specialty Services.  (*Id.* at 11:2-12; *see* 1st Morse Decl. ¶ 11, Ex.

16  10 ("Henson Email") at 1.)  Mr. Blenz is transgender, as is one other WISe team member.

17  (Blenz Dep. at 28:15-21, 59:19-20; Henson Decl. ¶ 13.)

18  **B.    VCCC Begins Training on Pronoun Usage**

19    In or around 2020, VCCC began training its staff on the use of clients' preferred

20  names and pronouns.  (*See* 1st Morse Decl. ¶ 5, Ex. 4 ("Pl. Notes") at 2.)  VCCC

21  conducted one such training in August 2021, at which time the WISe Program

22  implemented and disseminated to all staff a Pronoun and Preferred Name Protocol (the

ORDER - 6

1    "Pronoun Protocol").  (Blenz Dep. at 33:16-24; Pl. Dep. at 31:2-6; *see also* Tribbett Decl.

2    ¶ 4, Ex. 7 ("Pronoun Protocol") at 389.)  The Pronoun Protocol applied to all WISe team

3    members (Pl. Dep. at 33:16-18), and provides as follows:

4              Creating an inclusive & welcoming environment:

5              • Include your pronouns in your introductions and email signatures.
               • When meeting a youth for the first time verify "it looks like Peter is
6                the name we have in our system for you.  Is that the name you'd like
                 us to use on our documentation and in meetings?"
7              • If a youth shares in a 1:1 setting that they have a different name or
                 pronouns they would like you to begin using, ask "Is it safe for me to
8                use that name/pronoun in team and family settings as well?"

9          When a youth identifies that they have pronouns and/or preferred name they
           would like used throughout WISe by all team members:

10             • Update the pronoun and/or preferred name field in Credible[6]
11             • Ensure all WISe team members are aware of the correct identifier
               • Begin using correct identifier on all documentation including:
12                  ○ Care Plan
                    ○ Crisis Plan
                    ○ Progress Notes
13             • Caseload Report will need to have legal/billing name included for
                 reporting purposes
14             • Utilize preferred identifier in all case consultations, supervision &
                 discussion about client with team members
15             • If it is necessary to use the youth's legal name for billing, legal or
                 other reasons, please use the following format:
16                  ○ "I have an update about Eric, whose legal name is James."

17   (Pronoun Protocol at 389.)  The Pronoun Protocol aligns with research and evidence

18   showing that "[i]t is extremely detrimental to mental and behavioral health" to "deny[]

19   trans[gender] people their authentic experience of who they are" by "misgendering them"

20   and "not validating them," which "significantly increases rates of suicide."  (Blenz Dep.

21   _____

22       [6] Credible is the electronic operating platform that VCCC uses to document client health
     records and staff records.  (*See* Pl. Dep. 48:20-49:4.)

ORDER - 7

at 61:8-12.)  For these reasons, if VCCC does not "honor the client's wishes about preferred name and pronoun, [it] caus[es] them harm."  (Henson Decl. ¶ 13; *see also* Pl. Dep. at 51:15-18, 68:16-22 (Ms. Trueblood testifying that failure to use preferred names and pronouns can cause transgender youth to "feel ostracized or rejected" and "disrespected").)

On February 28, 2022, the WISe Program hired a third-party vendor to conduct a training exercise focused on proactive crisis and safety planning.  (Blenz Dep. at 14:23-15:2; Pl. Notes at 2.)  The training involved "role plays and vignettes" in which imaginary clients "with varying identities and experiences" presented at VCCC in crisis, and WISe team members collaborated to respond.  (Blenz Dep. at 15:2-18.)  During one vignette exercise that involved a nonbinary youth client, Mr. Blenz observed Ms. Trueblood and one other staff member repeatedly failing to use the imaginary client's preferred pronouns.  (1st Morse Decl. ¶ 7, Ex. 6 ("Blenz Email") at 2.)  In response, Mr. Blenz gave about five "quick reminders" to use correct pronouns before stopping the group "with a more firm reminder" that the vignette was specifically focused on the youth client's nonbinary identity "and not being accepted by their family."  (Blenz Email at 2.)  Mr. Blenz instructed that WISe team members "need to be the ones to affirm [the client's] gender and pronouns," and "they/them pronouns" were the only accurate and acceptable pronouns for this client.  (*Id.*)  Thereafter, Ms. Trueblood "continued to use incorrect pronouns consistently throughout the training."  (*Id.*)  Mr. Blenz reported the incident to Ms. Williams, Ms. Trueblood's supervisor.  (*See generally id.*)

//

1    On March 4, 2022, Ms. Trueblood met with Ms. Williams for a regular

2 one-on-one check-in meeting called a "supervision."  (Pl. Dep. at 48:8-19; 1st Morse

3 Decl. ¶ 8, Ex. 7 ("3/4/22 Supervision").)  Among other discussion points, Ms. Williams

4 raised the topic of pronoun use.  (3/4/22 Supervision.)  Ms. Trueblood "shared that her

5 intent was not to disrespect anyone," and the two discussed "impact versus intent."  (*Id.*)

6 Ms. Williams identified correct pronoun use as "an area of growth," asked Ms. Trueblood

7 "to come up with a plan to increase awareness around the use of correct pronouns moving

8 forward," and stated the conversation would continue at Ms. Trueblood's next

9 supervision.  (*Id.*; *see also* Pl. Dep. at 50:17-52:7.)  At this point, Ms. Trueblood had

10 already decided that she would never use preferred pronouns, but she did not inform Ms.

11 Williams of this decision.  (Pl. Dep. at 52:8-11, 53:14-22.)

12 **C.    VCCC Assigns Ms. Trueblood Clients Who Use Preferred Pronouns**

13    In or around April 2022, Ms. Trueblood was assigned a gender nonconforming

14 youth client whose legal name was "A," but who preferred the name "M" and used

15 they/them pronouns.[7]  (Pl. Notes at 2, 4; Pl. Dep. at 54:3-18, 64:3-12.)  Although Ms.

16 Trueblood knew that M preferred they/them pronouns, she shared with M's mother her

17 "intention" to use the pronouns that M "was assigned at birth."  (Pl. Notes at 4; *see* Pl.

18 Dep. at 59:18-61:8 (Ms. Trueblood stating it was her idea "to call M by the assigned or

19 biological pronouns" and she made the "conscious choice" to do so), 64:13-17.)  M's

20 mother—who was not accepting of M's preferred name and pronouns—expressed

21

22    [7] The court refers to youth clients using their first initials for confidentiality purposes.

appreciation.  (Pl. Notes at 4.)  In early June, Ms. Trueblood consulted with a WISe team

facilitator and M's mother, and all agreed that Ms. Trueblood should call the "youth by

the name mom uses" because Ms. Trueblood was a parent partner, not a peer counselor.

(*Id.* at 2.)

Around the same time, Ms. Trueblood was assigned another gender

nonconforming youth client C, who preferred they/them pronouns.  (*Id.* at 4; Pl. Dep. at

61:20-25.)  On June 2, 2022, Ms. Trueblood called C's mother, who was in distress

because C had been physically assaulted at school due to their gender identity.  (Pl. Notes

at 4; Pl. Dep. at 58:11-23.)  The mother informed Ms. Trueblood of C's pronoun

preference and "kept on mistakenly using non-preferred pronouns," but nevertheless

indicated she "was trying to use the pronouns that C wanted used" and intended to honor

C's preference.  (Pl. Dep. at 59:2-5.)  At this point, Ms. Trueblood felt she "may not be

the best fit for the team," and raised her religious beliefs in her next supervision with Ms.

Williams on June 9, 2022.  (Pl. Notes at 2, 4.)  Ms. Williams indicated she was surprised

but respected Ms. Trueblood's religious beliefs.  (*Id.* at 2.)  The two discussed

expectations around preferred name and pronoun usage, and Ms. Williams advised she

would connect with Ms. Boye regarding Ms. Trueblood's concerns.  (*Id.*; 1st Morse Decl.

¶ 9, Ex. 8 ("Corrective Action") at 1.)

On June 23, 2022, Ms. Trueblood attended another regular supervision with Ms.

Williams.  (Pl. Notes at 3; 1st Morse Decl. ¶ 14, Ex. 13 ("6/23/22 Supervision").)

Among other topics, the two again discussed pronoun usage including the "damage that

can be caused by not referring to [the] client appropriately."  (6/23/22 Supervision.)  Ms.

1  Williams also informed Ms. Trueblood of WAC 162-32-040, a Washington regulation

2  that prohibits the deliberate misuse of an individual's preferred name, form of address, or

3  gender-related pronoun in places of employment and public accommodation.  (*Id.*)  *See*

4  *generally* WAC 162-32-040.  The two discussed potential next steps, and Ms. Trueblood

5  offered to be removed from C's care team and asked to review the cited regulation.

6  (6/23/22 Supervision.)

7  **D.    Ms. Trueblood Faces Discipline and Requests Religious Accommodations**

8          By June 29, 2022, Ms. Trueblood knew a corrective action meeting was scheduled

9  to take place the following day, "so [she] sent a request for religious accommodations to

10 [Human Resources ('HR')]."  (Pl. Notes at 3; *see* Pl. Dep. at 71:6-16.)  Specifically, Ms.

11 Trueblood emailed Ms. Williams, Ms. Boye, and HR after hours requesting the following

12 five workplace accommodations "based on religious beliefs and freedom of speech":

13    1. To offer to not work with clients who use preferred pronouns
         [("Accommodation One")]
14    2. To use a person's name (co-workers and clients) rather than preferred
         pronouns [("Accommodation Two")]
15    3. To pass on my pronoun when giving introductions [("Accommodation
         Three")]
16    4. To not state my pronoun on email signature [("Accommodation Four")]
17    5. To not use preferred pronouns but rather the person's name in case
         consultation,  supervision  and  discussion  with  team  members.
         [("Accommodation Five")]
18

19 (Tribbett Decl. ¶ 7, Ex. 12 ("Request") at 471.)  The following morning, HR created a

20 new "ticket" and responded to Ms. Trueblood by email, stating it would review and

21 respond to her request for accommodations "as soon as possible."  (Request at 471.)

22 Later, pursuant to VCCC's standard protocol, HR provided Ms. Trueblood an

1   accommodation request form to return and complete, which she did.  (2d Morse Decl.

2   (Dkt. # 23) ¶ 3, Ex. A ("Doc. Prod.") at 21; Henson Decl. at 10.)

3         The corrective action meeting proceeded as planned on June 30, 2022.  (Corrective

4   Action at 1; Pl. Notes at 3.)  Ms. Williams and Ms. Boye conducted the meeting and

5   thereafter issued a "Corrective Action Disciplinary Notice."  (Corrective Action at 1.)

6   That notice described the nature of the problem as follows:

7         [Ms. Trueblood] has been observed using incorrect pronouns when referring
          to clients, after being informed of their chosen pronouns and preferred name.
8         This has occurred in staff trainings, supervision, collaboration with
          colleagues, and in client meetings.  [Ms. Trueblood] has stated to her
9         colleagues and supervisor that she will not use [the] client's chosen
          pronouns.

10  (*Id.*)  The notice also listed several prior discussions and warnings as well as relevant

11  organizational policies on the subject.  (*Id.*)  In particular, the notice identified WAC

12  162-32-040 (which prohibits the deliberate misuse of one's preferred pronouns, name,

13  and form of address), the Pronoun Protocol (which directs staff to use clients' preferred

14  identifiers), and VCCC's Staff Principles (which require staff to treat everyone with

15  dignity and respect).  (*Id.*; *see* Pronoun Protocol at 389; Staff Principles); WAC

16  162-32-040.  Following this meeting, Ms. Trueblood was to take "corrective action" by

17  beginning to use clients' preferred names and pronouns, practicing using correct names

18  and pronouns, and attending training on gender-affirming care.  (Corrective Action at 2.)

19  Ms. Trueblood agreed to participate in the training, but not to use or practice using

20  correct names and pronouns.  (*Id.*)  VCCC also warned that "[a]djustments may be made"

21  to Ms. Trueblood's caseload as necessary (*id.*), and at some point, VCCC removed Ms.

22

1  Trueblood from M and C's care teams (Pl. Notes at 3; Pl. Dep. at 70:7-9; Tribbett Decl.

2  ¶ 17, Ex. 22 at 510-11).

3        Meanwhile, VCCC's Chief Administrative Officer, Jamie Noritake Henson, began

4  reviewing Ms. Trueblood's accommodation requests.  (Henson Decl. ¶¶ 10-11.)  Ms.

5  Henson consulted a number of employees and stakeholders, including Ms. Williams, Ms.

6  Boye, Angie Guerrero of HR, Director of Outpatient Services Megan Kelly, and CEO

7  Shekh Ali.  (*Id.* ¶ 10.)  Ms. Boye immediately raised concerns about Ms. Trueblood's

8  proposal to address transgender clients and staff by name rather than preferred pronouns.

9  (*Id.* ¶ 10, Ex. D ("Boye Email") at 2.)  To illustrate how it would sound to omit pronouns,

10 Ms. Boye provided the following example, using Mr. Ali's name:  "Shekh drank Shekh's

11 coffee while Shekh was in Shekh's office."  (Boye Email at 2.)  In Ms. Boye's view, this

12 was not sustainable because Ms. Trueblood had "already been trying to do this and ke[pt]

13 'accidentally' using the wrong pronoun instead of the name."  (*Id.*)  Ms. Boye added that

14 "[b]ecause [Ms. Trueblood] doesn't speak about everyone in this odd way, it just creates

15 confusion and 'others' the person who she is speaking about."  (*Id.*)

16        Over the span of approximately two weeks, Ms. Henson continued to review

17 recommendations from leadership and gather information.  (*See* Henson Decl. ¶¶ 10-14.)

18 She also consulted outside legal counsel and reviewed guidance from the Equal

19 Employment Opportunity Commission.  (*Id.* ¶ 11.)  By July 11, 2022, Ms. Kelly emailed

20 Ms. Guerrero of HR to inquire about a timeline for the review process, noting her

21 concern that Ms. Trueblood was "continuing to engage with clients and her colleagues in

22 a way that violates our internal policies and [WAC 162-32-040]."  (Tribbett Decl. ¶ 10,

Ex. 15 ("Kelly Emails") at 485.)  Ms. Kelly expressed a need for urgent action, noting

that "today," Ms. Trueblood "misgendered frequently" and VCCC has "numerous youth

struggling with gender issues" and "transgender[] staff who are continuously offended

but do not want to formally complain."  (Kelly Emails at 483 (stating Ms. Trueblood "is

violating state and federal laws" and "I personally am saddened by her stance"), 485

("We are going to get into trouble if we do not act.").)

**E.      VCCC Denies Three Accommodations and Ms. Trueblood's Employment
         Ends**

On July 15, 2022, Ms. Trueblood met with Ms. Henson and Ms. Guerrero.

(Henson Decl. ¶ 14.)  Ms. Henson explained that VCCC decided to approve

Accommodations Three and Four, granting Ms. Trueblood permission to pass on her

pronouns when giving introductions and to omit pronouns from her email signature

because these were "optional" activities.  (*Id.* ¶¶ 14-15.)  Ms. Henson also shared that

VCCC decided to deny Accommodations One, Two, and Five (the "Disputed

Accommodations").  (*Id.*)  Regarding Accommodation One, Ms. Henson explained that

"[g]ender identity is a protected classification and working with clients on the basis of

their pronouns would be discriminating on the basis of this protected classification."

(Henson Email at 3 (recapping the July 15 meeting).)  Regarding Accommodations Two

and Five, Ms. Henson explained that

> [u]sing names rather than pronouns when communicating with individuals
> would need to be done on a non-discriminatory basis.  To clarify, employees
> cannot use pronouns for people whose biology matches their identity but
> refuse to use pronouns when the identity doesn't match the biology.  It would
> need to be consistent in every interaction, otherwise again it is discrimination
> on the basis of gender identity.

1   (*Id.* at 3-4 (recapping meeting).)  Ms. Henson asked "if there were any other options to

2   address the situation." (Henson Decl. ¶ 14.)  Ms. Trueblood "maintained that she would

3   not agree to any scenario where she used preferred pronouns," and that she "would not

4   use any pronouns with staff and clients that used preferred pronouns." (*Id.*)

5        Ms. Henson followed up by email on July 18, 2022, memorializing her

6   conversation with Ms. Trueblood and the basis for VCCC's decision:  "In summary, we

7   are unable to accommodate your request[s] that infringe[] on others' rights to be free

8   from discrimination on the basis of their protected classification," specifically "gender

9   and/or gender identity." (Henson Email at 3-4 (citing WAC 162-32-040 and other

10  relevant anti-discrimination resources and legal provisions, including Title VII of the

11  Civil Rights Act of 1964 ("Title VII")).)  Ms. Henson further advised that "[t]o continue

12  employment with [VCCC], we will require your commitment that your beliefs do not

13  interfere with your ability to serve all clients equally." (*Id.* at 4.)  Because Ms. Trueblood

14  had "opted not to resign," VCCC would "need to make the difficult decision to separate

15  employment" if Ms. Trueblood could not commit "to work with all clients and employees

16  regardless of gender identity." (*Id.*)

17       Ms. Trueblood responded by email the following day to clarify her requests and

18  "ensure" that no accommodation was possible. (1st Morse Decl. ¶ 13, Ex. 12

19  ("Trueblood Email").)  She explained,

20       [m]y religious convictions require me to be honest and to avoid bearing false
         witness.  I believe that God lovingly created all human beings in His image,
21       and every person deserves the utmost respect and freedom of conscience.  I
         believe that He created male and female, and that even if a person appears
22       male or female, their chromosomes cannot be changed.  As a result, were I

to use pronouns that I know are not correct, biologically and/or chromosomally, I believe that I would be speaking falsely, which would violate my religious beliefs.  At the same time, since names are not inherently gendered, I am happy to use whatever name a person prefers.

(Trueblood Email at 1.)  Ms. Trueblood clarified that she had "never refused to work with any client or co-worker" based on gender identity.  (*Id.*)  Accommodation One would have simply allowed her to "offer" not to work with clients who use preferred pronouns, which "seemed to be an easy accommodation" that would "avoid the pronoun issue altogether."  (*Id.*)  Alternatively, Accommodations Two and Five (*i.e.*, omitting pronouns and using names only) would allow her "to comply with [her] religious beliefs while continuing to refer to the client in a respectful and dignified manner, using the name the client prefers."  (*Id.* at 2.)

In response, Ms. Henson reiterated that VCCC was "required to provide non-discriminatory services to all clients and ensure our employees are abiding by federal and state laws regarding gender identi[t]y and gender affirming care."  (*Id.* at 1.)  "[R]efusal to acknowledge/use an individual's pronouns is discrimination."  (*Id.*)  Ms. Henson attached to her message a termination letter, which ended Ms. Trueblood's employment at VCCC as of July 19, 2022.  (Termination Letter at 500.)  The letter stated that Ms. Trueblood was terminated by "mutual agreement, as [VCCC] could not accommodate [Ms. Trueblood's] request[s] for religious accommodation."  (*Id.*)  Other stated reasons for termination included the violation of VCCC's Compliance and Ethics Policy, federal guidance on gender-affirming care, and Title VII guidelines.  (*Id.*)  Ms.

//

1   Trueblood responded by email, expressing disagreement that her termination was a

2   mutual decision.  (Tribbett Decl. ¶ 14, Ex. 19 at 502.)

3   **F.   Procedural History**

4           On February 23, 2023, Ms. Trueblood filed this lawsuit, claiming VCCC and five

5   Doe defendants (the "Doe Defendants"):  (1) failed to accommodate her religious

6   practices in violation of Title VII, 42 U.S.C. § 2000e, *et seq.*, and the Washington Law

7   Against Discrimination ("WLAD"), ch. 49.60 RCW; and (2) retaliated against her in

8   violation of Title VII.  (Compl. (Dkt. # 1) ¶¶ 6-7, 32-53.)  In her complaint, Ms.

9   Trueblood stated she would seek leave to amend "to assert the true names and capacities

10  of [the Doe Defendants] when the same have been ascertained" (*id.* ¶ 7), though she

11  never did so (*see generally* Dkt.).

12          VCCC waived service of the complaint and agreed to answer by no later than May

13  5, 2023.  (*See* Waiver (Dkt. # 3) (requiring an answer or motion under Federal Rule of

14  Civil Procedure 12 "within 60 days from" March 6, 2023).)  Although the case

15  progressed through discovery, VCCC inadvertently failed to file its answer to the

16  complaint until June 24, 2024—four days before the dispositive motions deadline.

17  (Answer (Dkt. # 15); 2d Morse Decl. ¶ 4; *see* 4/2/24 Order (Dkt. # 14) (setting deadline

18  of June 28, 2024).)  Now before the court are Ms. Trueblood's and VCCC's

19  cross-motions for summary judgment.  (*See generally* Pl. MSJ; Def. MSJ.)

20                        **III.   ANALYSIS**

21          VCCC moves for summary judgment in its favor on each of Ms. Trueblood's

22  claims.  (*See generally* Def. MSJ.)  Ms. Trueblood opposes VCCC's motion (*see*

ORDER - 17

1   *generally* Pl. Resp.) and cross-moves for partial summary judgment in her own favor on

2   each of her claims against VCCC with respect to the issue of liability.  (*See generally* Pl.

3   MSJ (no request for summary judgment on the issue of damages, nor against the Doe

4   Defendants[8]).)  As the parties agree, the facts are largely undisputed and the issues are

5   ripe for decision.  (*See* Stip. Mot. (Dkt. ## 12-13) at 2 ("The parties desire to resolve this

6   case by dispositive motion practice, and do not intend to move forward to trial.").)  The

7   court begins its analysis by setting forth the relevant legal standard before turning to the

8   parties' arguments in favor of their respective motions.

9   **A.    Summary Judgment Legal Standard**

10          Summary judgment is appropriate if the evidence viewed in the light most

11  favorable to the non-moving party shows "that there is no genuine dispute as to any

12  material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

13  56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is "material" if it

14  might affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

15  (1986).  A factual dispute is "'genuine' only if there is sufficient evidence for a

16  reasonable fact finder to find for the non-moving party."  *Far Out Prods., Inc. v. Oskar*,

17  247 F.3d 986, 992 (9th Cir. 2001) (citing *Anderson*, 477 U.S. at 248-49).

---

18

19          [8] Ms. Trueblood has abandoned her claims against the Doe Defendants because she
    failed to address any such claims in her briefing.  (*See generally* Pl. MSJ; Pl. Resp.; *see also*
20  Compl. ¶ 7.)  "A party abandons an issue when it has a full and fair opportunity to ventilate its
    views with respect to an issue and instead chooses a position that removes the issue from the
    case."  *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1026 (9th Cir. 2009) (quoting *Davis v.*
21  *City of Las Vegas*, 478 F.3d 1048, 1058 (9th Cir. 2007)) (affirming summary judgment on state
    law claims where the plaintiff "abandoned his state law claims by not addressing them in either
22  his Motion for Partial Summary Judgment or his Opposition to Defendants' Motion or Summary
    Judgment").  The court therefore dismisses the Doe Defendants from this action.

ORDER - 18

1    The moving party bears the initial burden of showing there is no genuine dispute

2    of material fact and that it is entitled to prevail as a matter of law.  *Celotex*, 477 U.S. at

3    323.  If the moving party does not bear the ultimate burden of persuasion at trial, it can

4    show the absence of such a dispute in two ways:  (1) by producing evidence negating an

5    essential element of the nonmoving party's case, or (2) by showing that the nonmoving

6    party lacks evidence of an essential element of its claim or defense.  *Nissan Fire &*

7    *Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000).  If the moving party

8    meets its burden of production, the burden then shifts to the nonmoving party to identify

9    specific facts from which a factfinder could reasonably find in the nonmoving party's

10   favor.  *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.  Where cross-motions are at

11   issue, the court must "evaluate each motion separately, giving the nonmoving party in

12   each instance the benefit of all reasonable inferences."  *ACLU of Nev. v. City of Las*

13   *Vegas*, 466 F.3d 784, 790-91 (9th Cir. 2006); *Tulalip Tribes of Wash. v. Washington*, 783

14   F.3d 1151, 1156 (9th Cir. 2015) ("[W]hen simultaneous cross-motions for summary

15   judgment on the same claim are before the court, the court must consider the appropriate

16   evidentiary material identified and submitted in support of both motions, and in

17   opposition to both motions, before ruling on each of them." (quoting *Fair Hous. Council*

18   *of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001))).

19   **B.    Failure to Accommodate**

20   Title VII proscribes the discharge of any individual "because of" that individual's

21   religion.  42 U.S.C. § 2000e-2(a)(1).  To that end, an employer must "reasonably

22   accommodate" an employee's religious practices unless doing so would pose an "undue

1    hardship on the conduct of the employer's business."  42 U.S.C. § 2000e(j); *see EEOC v.*

2    *Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 771-72 (2015) (discussing failure to

3    accommodate as a theory of disparate treatment, rather than a standalone Title VII claim).

4    Similarly, WLAD proscribes the discharge of any employee "because of . . . creed,"

5    RCW 49.60.180(3), and requires employers to "reasonably accommodate an employee's

6    religious practices" unless such an accommodation would pose an undue hardship on the

7    employer, *Kumar v. Gate Gourmet Inc.*, 325 P.3d 193, 197, 203 (Wash. 2014) ("[T]he

8    term 'creed' in the WLAD refers to religious belief.").

9            Under both Title VII and WLAD, courts employ a burden-shifting framework to

10   analyze failure-to-accommodate claims.  *Bolden-Hardge v. Off. of Cal. State Controller*,

11   63 F.4th 1215, 1222 (9th Cir. 2023) (Title VII); *see Kumar*, 325 P.3d at 203 (WLAD).

12   The employee must first establish a *prima facie* case of failure to accommodate her

13   religion.  *Bolden-Hardge*, 63 F.4th at 1222; *see Kumar*, 325 P.3d at 203.  To do so, the

14   employee must show:  (1) she had a bona fide religious belief, the practice of which

15   conflicted with an employment duty; (2) she informed her employer of the belief and the

16   conflict; and (3) the employer discharged, threatened, or otherwise subjected her to an

17   adverse employment action because of her inability to fulfill the job requirement.

18   *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 606 (9th Cir. 2004); *Kumar*, 325 P.3d at

19   501.  If the employee establishes a *prima facie* case, the burden shifts to the employer to

20   "show that it was nonetheless justified in not accommodating the employee's religious

21   beliefs or practices."  *Bolden-Hardge*, 63 F.4th at 1222; *accord Kumar*, 325 P.3d at 203.

22   Under Title VII, an employer can meet this burden by showing "that it 'initiated good

ORDER - 20

1    faith efforts to accommodate reasonably the employee's religious practices or that it

2    could not reasonably accommodate the employee without undue hardship.'" *Peterson*,

3    358 F.3d at 606 (quoting *Tiano v. Dillard Dep't Stores, Inc.*, 139 F.3d 679, 681 (9th Cir.

4    1998)).  Similarly, an employer can meet its burden under WLAD by showing the

5    "accommodation would be an undue hardship." *Kumar*, 325 P.3d at 203 (internal

6    quotation marks omitted).

7        Here, VCCC concedes the second and third elements of Ms. Trueblood's *prima*

8    *facie* case, acknowledging she "requested accommodations to conform to her beliefs" and

9    "VCCC ultimately made the very difficult decision to separate [Ms. Trueblood]'s

10   employment when she refused to treat all clients and staff equally, which was a

11   requirement of her job." (Def. Resp. at 5.)  VCCC "does not concede," however, that

12   Ms. Trueblood "had a bona fide religious belief that conflicted [with] her duties as an

13   employee." (Def. MSJ at 14 n.1 (arguing in a footnote why this first element is not met).)

14   For purposes of the instant motions, the court will assume without deciding that Ms.

15   Trueblood has established a *prima facie* case of failure to accommodate religion.

16       Accordingly, the court's central inquiry is whether VCCC has met its burden to

17   show it was "justified in not accommodating [Ms. Trueblood]'s religious beliefs or

18   practices." *Bolden-Hardge*, 63 F.4th at 1222.  The court concludes VCCC is not entitled

19   to summary judgment based solely on good faith efforts to accommodate Ms.

20   Trueblood's religious practices, but VCCC nevertheless prevails on Ms. Trueblood's

21   failure-to-accommodate claims because it establishes undue hardship as a matter of law.

22   //

1            1.   Good Faith Efforts

2            As noted, once an employee establishes a *prima facie* case of failure to

3   accommodate religion under Title VII, "the burden shifts to the employer to prove that it

4   made good faith efforts to accommodate that employee's religious belief." *Am. Postal*

5   *Workers Union, S.F. Loc. v. Postmaster Gen.*, 781 F.2d 772, 776 (9th Cir. 1986).  An

6   employer meets this burden "when it demonstrates that it has offered a reasonable

7   accommodation to the employee." *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 69

8   (1986).  If an employer suggests a possible accommodation, this triggers "[a]n

9   employee's 'concomitant duty' to cooperate" "in the search for an acceptable

10  reconciliation of the needs of the employee's religion and the exigencies of the

11  employer's business." *Heller v. EBB Auto Co.*, 8 F.3d 1433, 1440 (9th Cir. 1993) (first

12  quoting *Am. Postal Workers*, 781 F.2d at 777; then quoting *Ansonia*, 479 U.S. at 69).  But

13  "[w]hen an employer does not propose an accommodation, or when its proposed

14  accommodation does not eliminate the employee's religious conflict, the employer must

15  accept the employee's proposal or demonstrate that the proposal would cause the

16  employer undue hardship." *EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 615 (9th

17  Cir. 1988); *accord Opuku-Boateng v. California*, 95 F.3d 1461, 1467 (9th Cir. 1996).

18          In this case, VCCC presents no evidence that it proposed to Ms. Trueblood a

19  reasonable alternative accommodation that would have eliminated the religious conflict.

20  Accordingly, and because VCCC ultimately declined three of Ms. Trueblood's five

21  proposed accommodations, VCCC fails to establish it made good faith efforts to

22  reasonably accommodate Ms. Trueblood's religious beliefs. *See Townley*, 859 F.2d at

1   615.  VCCC can escape liability only if it establishes that the Disputed Accommodations

2   would have posed an undue hardship.  *See id.*

3        Analogizing to *Peterson v. Hewlett-Packard Co.*, VCCC argues it made good faith

4   efforts to reasonably accommodate Ms. Trueblood's religious beliefs because VCCC

5   took some "initial step[s]" to that end.  (Def. Resp. at 5-7 (quoting *Peterson*, 358 F.3d at

6   606).)  Specifically, VCCC asserts it "went far beyond the good faith steps taken in

7   *Peterson*" by "carefully reviewing" Ms. Trueblood's requests, "consult[ing] numerous

8   stakeholders and legal counsel," meeting with Ms. Trueblood herself, and granting two of

9   the five requested accommodations.  (*Id.*)  VCCC appears to read *Peterson* as holding

10  that an employer can satisfy its duty to make good faith efforts by taking *any* initial steps

11  to consider the employee's requested accommodations, regardless of whether the

12  employer proposed a reasonable alternative accommodation.  VCCC misreads *Peterson*

13  and misapprehends its burden.

14        In *Peterson*, the Ninth Circuit stated that "[a]n employer's duty to negotiate

15  possible accommodations ordinarily requires it to take 'some initial step to reasonably

16  accommodate the religious belief of that employee.'"  358 F.3d at 606.  The court then

17  observed the employer had "convened at least four meetings with" the employee,

18  "attempt[ing] to determine whether it would be possible to resolve the conflict in a

19  manner that would respect the dignity of" other staff.  *Id.*  But, the court did not stop

20  there:  "Given [the employee]'s refusal to consider other accommodations," the court

21  "proceed[ed] to evaluate whether one or both of the 'acceptable' accommodations would

22  have imposed undue hardship upon" the employer.  *Id.* at 607; *see id.* at 608 (affirming

1  summary judgment in employer's favor on the basis of undue hardship).  At no point did

2  the *Peterson* court hold as a matter of law that the employer met its burden to show it

3  undertook good faith accommodation efforts.  It would have been unnecessary to reach

4  the undue hardship defense if the *Peterson* court had so held.  *See id.* at 606 (stating the

5  employer must show good faith efforts *or* undue hardship); (*see also* Def. Resp. at 4

6  (acknowledging this requirement "is set forth in the disjunctive," and an employer "need

7  only show" one of the two)).  Because *Peterson* was decided solely on undue hardship

8  grounds, this court rejects VCCC's analogy to *Peterson* regarding VCCC's good faith

9  efforts.  *Peterson* does not support resolving this case on the basis of good faith efforts

10  alone where VCCC declined to propose any alternative accommodations.

11       In sum, VCCC fails to show it "offered a reasonable accommodation to" Ms.

12  Trueblood that would have eliminated the religious conflict.  *Ansonia*, 479 U.S. at 69.

13  Thus, VCCC was required to "accept [Ms. Trueblood]'s proposal or demonstrate that the

14  proposal would cause the employer undue hardship." *Townley*, 859 F.2d at 615.  Because

15  VCCC ultimately denied three of five requested accommodations, the court proceeds to

16  consider whether implementing the Disputed Accommodations would have imposed

17  undue hardship upon VCCC.

18       2.  Undue Hardship

19       "Undue hardship is an affirmative defense" that VCCC must plead and prove.

20  *Bolden-Hardge*, 63 F.4th at 1224; *see also Green v. Jame*s, 473 F.2d 660, 661 (9th Cir.

21  1973).  The court begins its analysis of undue hardship by addressing Ms. Trueblood's

22  procedural challenge to VCCC's untimely answer to the complaint.

1

       *a.  VCCC's Untimely Answer*

2

       Ms. Trueblood argues VCCC cannot escape liability on her

3

failure-to-accommodate claims based on an affirmative defense—undue hardship—that

4

VCCC failed to timely plead.  (*See* Pl. MSJ at 12-16.)  Although VCCC filed its answer

5

over 13 months beyond the deadline, Ms. Trueblood did not move to strike the pleading.

6

(*See generally* Dkt.)  VCCC argues that "[e]ven if there were a motion to strike pending,"

7

Ms. Trueblood cannot demonstrate prejudice from the delay because her litigation

8

conduct shows she has long understood VCCC's intent to assert an undue hardship

9

affirmative defense.  (Def. Resp. at 7-10.)

10

       Federal Rule of Civil Procedure 12 governs defense pleading but "does not

11

provide a specific sanction for late filing of an answer."  *McCabe v. Arave*, 827 F.2d 634,

12

639 n.5 (9th Cir. 1987).  The Ninth Circuit has directed that a district court may exercise

13

its inherent power to strike an untimely answer as a sanction for bad faith conduct.  *Id.* at

14

639-40.  Thus, "the mere fact that an answer was untimely filed does not necessarily

15

result in an automatic exclusion of a defendant's affirmative defenses."  *Est. of Hirata v.*

16

*Ida*, No. 10-00084 LEK-RLP, 2011 WL 3290409, at *3 (D. Haw. June 14, 2011) (citing

17

*McCabe*, 827 F.2d at 639-40).  Rather, the district court has discretion to strike a

18

late-filed answer, and it may issue such a sanction only upon a finding of bad faith.

19

*McCabe*, 827 F.2d at 640 (finding no abuse of discretion in declining to strike untimely

20

answer filed on the first day of trial where defense counsel's delay was in "good faith, but

21

inadvertent").

22

*//*

1    The court declines to strike or otherwise disregard VCCC's untimely answer

2    because the record does not a support a finding of bad faith.  The court accepts defense

3    counsel's representation that the late filing was an "inadvertent" oversight (2d Morse

4    Decl. ¶ 4), and admonishes defense counsel for such extreme and irresponsible delay.

5    Nevertheless, VCCC participated and cooperated in discovery, which evidences VCCC's

6    intent to defend the merits of Ms. Trueblood's claims, rather than bad faith.  (*See* Stip.

7    Mot. at 2 ("The parties have worked together regarding discovery and all discovery has

8    been completed by the required date . . . .").)  Moreover, the court can adduce no

9    prejudice to Ms. Trueblood.  Although she suggests she lacked fair notice of VCCC's

10   undue hardship affirmative defense (*see* Pl. MSJ at 13), this assertion is belied by the

11   record, which shows that Ms. Trueblood sought and received discovery concerning undue

12   hardship.  (*See, e.g.*, 2d Morse Decl. ¶ 7, Ex. B at 3-4 (Ms. Trueblood's notice of

13   deposition pursuant to Federal Rule of Civil Procedure 30(b)(6), identifying as "matters

14   of inquiry" "the standard of undue burden considered at the time of the accommodation

15   decision" and "[w]hether any and/or all possible accommodations would pose an undue

16   hardship on [VCCC]"); *id.* ¶ 8, Ex. C ("Henson Dep. Supp.") at 125:10-15 (Ms.

17   Trueblood's attorney asking Ms. Henson, VCCC's Rule 30(b)(6) deponent, "[h]ow is

18   there a risk, harm, or burden" in accommodating a request to use first names only and

19   Ms. Henson responding that "[i]t's discriminatory").)  Ms. Trueblood "has not identified

20   what specific discovery" she would have otherwise sought had VCCC timely filed its

21   answer.  *Hirata*, 2011 WL 3290409, at *3.  This court is also mindful of the strong public

22   policy in favor of resolving cases on their merits.  *See In re Amazon Serv. Fee Litig.*, ---F.

1  Supp. 3d ----, 2023 WL 8472724, at *3 (W.D. Wash. Dec. 7, 2023) (stating motions to

2  strike affirmative defenses "are generally disfavored" in part "because of the strong

3  policy favoring resolution on the merits").

4      For all of these reasons, the court rejects Ms. Trueblood's invitation to disregard

5  VCCC's untimely answer.  The court now proceeds to consider the merits of VCCC's

6  undue hardship affirmative defense.

7          *b. Undue Hardship Legal Standard*

8      Last year, the United States Supreme Court unanimously clarified the meaning of

9  "undue hardship" under Title VII.  *See generally Groff v. DeJoy*, 600 U.S. 447 (2023).  In

10  decades past, an employer could demonstrate undue hardship by showing an

11  accommodation would have required the employer to bear "more than a *de minimis* cost."

12  *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977).  Then came *Groff*.  *Groff*

13  concerned an Evangelical Christian postal worker who requested not to work on Sundays

14  in observation of his Sunday Sabbath practices.  *Id.* at 454-55.  Mr. Groff repeatedly

15  faced discipline for failing to work on Sundays, until he ultimately resigned and sued his

16  employer under a failure-to-accommodate theory.  *Id.* at 455.  Applying the "*de minimis*

17  cost" test, the lower courts ruled in the employer's favor on the basis of undue hardship.

18  *Id.* at 456.  The U.S. Supreme Court, however, charted a different path.

19      Under *Groff*, an employer must demonstrate undue hardship by showing "that the

20  burden of granting an accommodation would result in substantial increased costs in

21  relation to the conduct of its particular business."  *Id.* at 470.  This is a "fact-specific

22  inquiry" that "takes into account all relevant factors in the case at hand, including the

1   particular accommodations at issue and their practical impact in light of the nature, size

2   and operating cost of an employer." *Id.* at 468, 470-71 (cleaned up).  Impacts on

3   co-workers can be relevant, but only where they "go on to affect the conduct of the

4   business." *Id.* at 472 (cleaned up).  "[A] hardship that is attributable to employee

5   animosity to a particular religion, to religion in general, or to the very notion of

6   accommodating religious practice cannot be considered 'undue.'" *Id.*  Moreover, "Title

7   VII requires that an employer reasonably accommodate an employee's practice of

8   religion, not merely that it assess the reasonableness of a particular possible

9   accommodation or accommodations." *Id.* at 473.  "Faced with an accommodation

10  request like Groff's," for example, "it would not be enough for [the] employer to

11  conclude that forcing other employees to work overtime would constitute an undue

12  hardship." *Id.*  "Consideration of other options, such as voluntary shift swapping, would

13  also be necessary." *Id.*

14        In the end, *Groff* elucidated that the "undue hardship" standard is more rigorous

15  than previously understood.  But the U.S. Supreme Court eschewed bright-line rules in

16  favor of a "context-specific" approach, leaving it to the lower courts to "resolve whether

17  a hardship would be substantial in the context of an employer's business in the

18  common-sense manner that [they] would use in applying any such test." *Id.* at 471, 473

19  (remanding for the lower courts to apply the newly-clarified undue hardship standard to

20  Groff's case "in the first instance").  The Washington Supreme Court recently endorsed

21  the *Groff* standard, holding "a court considering an 'undue hardship' defense in response

22  to a failure to reasonably accommodate an employee's religious practices under the

1   WLAD must apply the substantial burdens test." *Suarez v. Washington*, 552 P.3d 786,

2   798-99 (Wash. 2024) (citing *Groff*, 600 U.S. at 469).

3         After *Groff*, courts have overwhelmingly agreed that both economic and

4   non-economic costs remain relevant to the "undue hardship" analysis. *See, e.g.*,

5   *Lavelle-Hayden v. Legacy Health*, --- F. Supp. 3d ----, 2024 WL 3822712, at *8-10 (D.

6   Or. Aug. 14, 2024); *Kluge v. Brownsburg Com. Sch. Corp.*, --- F. Supp. 3d ----, 2024 WL

7   1885848, at *15 (S.D. Ind. Apr. 30, 2024); *Bordeaux v. Lions Gate Ent., Inc.*, 703 F.

8   Supp. 3d 1117, 1130 (C.D. Cal. 2023); *Smith v. City of Atlantic City*, 703 F. Supp. 3d

9   511, 524 (D. N.J. 2023); *Suarez*, 552 P.3d at 799.  The parties in this case do not dispute

10  that *Groff* left intact a long line of Ninth Circuit precedent shielding employers from

11  liability under Title VII where "accommodating an employee's religious beliefs would

12  require the employer to violate federal or state law because the existence of such a law

13  establishes undue hardship." *Bolden-Hardge*, 63 F.4th at 1225 (cleaned up); *accord*

14  *Peterson*, 358 F.3d at 607 ("[A]n employer need not accommodate an employee's

15  religious beliefs if doing so would result in discrimination against his co-workers or

16  deprive them of contractual or other statutory rights."); *Suarez*, 552 P.3d at 800 (holding

17  an accommodation that "violates state law," such as WLAD, "is unsurprisingly an undue

18  hardship" in the context of failure-to-accommodate claims under Washington law).  (*See*

19  Pl. MSJ at 19; Def. MSJ at 15-16.)  Even a "danger" of violating the law suffices to show

20  undue hardship. *Berry v. Dep't of Soc. Servs.*, 447 F.3d 642, 655 (9th Cir. 2006) (finding

21  undue hardship where proposed accommodations "create[d] a danger" that public

22  employer would violate the Establishment Clause).  Mere "potential" for liability

1    likewise suffices.  *Bolden-Hardge*, 63 F.4th at 1225; *Bhatia v. Chevron U.S.A., Inc.*, 734

2    F.2d 1382, 1384 (9th Cir. 1984) (finding undue hardship where proposed

3    accommodations required employer to "risk liability" under California health and safety

4    regulations).

5          In this case, VCCC denied three accommodations on the basis of undue hardship:

6    (1) Accommodation One, "[t]o offer to not work with clients who use preferred

7    pronouns"; (2) Accommodation Two, "[t]o use a person's name (co-workers and clients)

8    rather than preferred pronouns"; and (3) Accommodation Five, "[t]o not use preferred

9    pronouns but rather the person's name in case consultation, supervision and discussion

10   with team members."  (Henson Email at 3-4.)  VCCC argues the Disputed

11   Accommodations would impose undue hardship under *Bolden-Hardge* and its progeny by

12   requiring VCCC to run afoul of federal and state anti-discrimination law.  (Def. MSJ at

13   17-19.)  VCCC further argues that "allowing [Ms. Trueblood] to discriminate against

14   co-workers and clients based on their gender identity or expression is unquestionably an

15   undue burden" when "looking at the context of VCCC's mission and services."  (*Id.* at 19

16   (citing *Groff*, 600 U.S. at 471).)  The court agrees with VCCC.

17            *c.  VCCC Establishes Undue Hardship*

18         VCCC demonstrates undue hardship because the Disputed Accommodations

19   would sanction discrimination against VCCC's clients and staff and, at the very least,

20   create a danger of violating federal and state law, exposing VCCC to potential liability as

21   a result.  Indeed, the Disputed Accommodations implicate a web of federal and state

22   anti-discrimination law, as follows.

1    Title VII makes it unlawful for an employer "to discriminate against any

2    individual with respect to his compensation, terms, conditions, or privileges of

3    employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1); *Bostock*

4    *v. Clayton Cnty.*, 590 U.S. 644, 683 (2020) (interpreting "sex" under Title VII to

5    encompass sexual orientation and gender identity).  As the Ninth Circuit has explained:

6    "In the context of our civil rights laws, including Title VII, discrimination is the use of a

7    forbidden criterion"—such as sex—"as a basis for disadvantageous difference in

8    treatment."  *Rene v. MGM Grand Hotel, Inc.*, 305 F.3d 1061, 1067 (9th Cir. 2002) (en

9    banc) (plurality opinion) (emphasis omitted); *see also City of L.A., Dep't of Water &*

10   *Power v. Manhart*, 435 U.S. 702, 708 (1978) (holding employer violated Title VII by

11   requiring women to make larger pension contributions than men because that policy

12   could not "pass the simple test" of showing that female employees were treated the same

13   regardless of sex).  Title VII also "prohibits creation of a hostile work environment,"

14   defined as a workplace "so pervaded by discrimination that the terms and conditions of

15   employment were altered."  *Vance v. Ball*, 570 U.S. 421, 427 (2013); *see Harris v.*

16   *Forklift Sys.*, 510 U.S. 17, 20 (1993) (explaining that Title VII does not tolerate a

17   workplace "permeated with discriminatory intimidation, ridicule, and insult" that is

18   "objectively hostile or abusive" (internal quotation marks omitted)).  An employer is

19   liable for a hostile work environment if it was negligent in failing to prevent the

20   offending conduct, regardless of whether or not the offender is a supervisor.  *Vance*, 570

21   U.S. at 446-49.

22   *//*

1    Similarly, WLAD makes it unlawful for an employer to "discriminate against any

2    person in compensation or in other terms or conditions of employment because of"

3    gender expression or identity.  RCW 49.60.180(3) (proscribing discrimination on the

4    basis of sexual orientation); RCW 49.60.040(29) (defining "sexual orientation" to include

5    "gender expression or identity").  An employer can be liable under WLAD for a hostile

6    work environment stemming from harassment on the basis of gender expression or

7    identity if supervisory personnel become aware of the harassment and fail to "take

8    remedial action that is reasonably calculated to end the harassment."  *See Perry v. Costco*

9    *Wholesale, Inc.*, 98 P.3d 1264, 1267-68 (Wash. Ct. App. 2004) (noting that harassment

10   must be sufficiently pervasive to affect the terms and conditions of employment for

11   liability to attach under the WLAD).

12   WLAD also proscribes discrimination on the basis of gender expression or identity

13   in places of public accommodation, such as VCCC.[9]  RCW 49.60.030(1)(b); RCW

14   49.60.040(29).  In particular, it is unlawful "for any person or the person's agent or

15   employee to" commit any "act which directly or indirectly results in any distinction,

16   restriction, or discrimination" in a place of public accommodation.  RCW 49.60.215(1);

17   RCW 49.60.040 (broadly defining "person" to include any "owner, lessee, proprietor,

18   manager, agent, or employee," among other individuals).  "Employers are liable for their

19   employees' discriminatory conduct toward a customer in a place of public

20

21   _____
     [9]  VCCC is a place of public accommodation because it offers healthcare and medical
     services to the public.  RCW 49.60.040(2).  *See, e.g.*, *Floeting v. Grp. Health Coop.*, 434 P.3d
22   39, 40 (Wash. 2019) ("Group Health, a nonprofit health care system . . . is a place of public
     accommodation.").

1    accommodation." *Floeting v. Grp. Health Coop.*, 434 P.3d 39, 45 (Wash. 2019).  Unlike

2    the employment context, however, even "[a] single discriminatory act in a place of public

3    accommodation may violate WLAD."  *Id.* at 43 (rejecting the "pervasiveness" standard

4    applicable to employment cases in favor of a "strict liability" approach).

5         The Washington State Human Rights Commission has adopted regulations that

6    "interpret[] and implement[] the sexual orientation and gender expression and gender

7    identity discrimination protections of" WLAD.  WAC 162-32-010.  "Harassment based

8    on an individual's sexual orientation or gender expression or gender identity is

9    prohibited."  WAC 162-32-040(1).  In employment settings, "[s]exual orientation or

10   gender identity harassment" is "offensive and unwelcome behavior serious enough to

11   affect the terms and conditions of employment" that "occurred because of an individual's

12   sexual orientation or gender expression or gender identity, and can be imputed to the

13   employer."  *Id.*  In public accommodation settings, "[s]exual orientation harassment or

14   [gender identity] harassment . . . is offensive and unwelcome behavior" that is "serious

15   enough to alter the individual's experience at the place of public accommodation," that

16   occurred because of the individual's identity, and that "can be imputed to the place of

17   public accommodation."  WAC 162-32-040(3).  Prohibited conduct "may include, but is

18   not limited to . . . [a]sking unwelcome personal questions about an individual's sexual

19   orientation, gender expression or gender identity, transgender status, or sex assigned at

20   birth," and "[t]he deliberate misuse of an individual's preferred name, *form of address*, or

21   gender-related pronoun."  WAC 162-32-040(2)(a), (d) (emphasis added).

22   //

1    Against this backdrop, the court has little trouble concluding that the Disputed

2    Accommodations impose undue hardship upon VCCC by placing it in the untenable

3    position of affronting both federal and state anti-discrimination law, and exposing it to

4    potential liability.  Beginning with Accommodations Two and Five, these requests would

5    have permitted Ms. Trueblood to address her transgender colleagues and clients by name

6    only, while addressing her cisgender colleagues and clients by both name *and* pronoun.

7    (Pl. Dep. at 96:24-97:3, 97:15-23.)  This practice would acknowledge and validate

8    cisgender individuals' identities without affording transgender individuals the same

9    courtesy, solely because they are transgender.  As VCCC explains, the effect is to create

10   "a second class of coworkers and clients not worthy of pronoun use."  (Def. MSJ at 19;

11   *see* Henson Dep. Supp. at 124:7-125:23 (explaining that using names only in lieu of

12   pronouns is "discriminatory" and "othering"); Boye Email at 2 (Ms. Boye explaining that

13   this strategy "is unsustainable" because Ms. Trueblood "doesn't speak about everyone in

14   this odd way," which "creates confusion and 'others' the person who she is speaking

15   about").)  Such a practice would treat transgender individuals differently, and

16   disadvantageously, on the basis of gender identity—that is discrimination, point blank.[10]

17   *See Rene*, 305 F.3d at 1067.  Neither Title VII nor WLAD requires an employer to

18

---

19       [10]  To be clear, treating an individual disadvantageously based on their use of preferred
     pronouns is no different than discriminating against an individual on the basis of gender
20   identity—the practice is facially discriminatory.  At a minimum, preferred pronoun usage is a
     proxy for transgender identity.  *See Schmitt v. Kaiser Found. Health Plan of Wash.*, 965 F.3d
21   945, 958 (9th Cir. 2020) (explaining that "proxy discrimination" "arises when the defendant
     enacts a law or policy that treats individuals differently on the basis of seemingly neutral criteria
22   that are so closely associated with the disfavored group that discrimination on the basis of such
     criteria is, constructively, facial discrimination against the disfavored group").

1   accommodate a plainly discriminatory practice.  *See Peterson*, 358 F.3d at 607 (holding

2   an employer need not accommodate discriminatory actions "that demean or

3   degrade . . . members of its workforce"); *Suarez*, 552 P.3d at 800 (holding "[a]n

4   accommodation requiring preferential treatment on the basis of religion to the detriment

5   of other protected classes" is an undue hardship).

6         Permitting Ms. Trueblood to proceed in this manner would also create at least

7   some potential for liability under a variety of federal and state discrimination theories.

8   *See Bolden-Hardge*, 63 F.4th at 1225; *Vance*, 570 U.S. at 446-49 (Title VII hostile work

9   environment); *Perry*, 98 P.3d at 1267-68 (WLAD hostile work environment); *Floeting*,

10  434 P.3d at 45 (WLAD public accommodations discrimination).  Specifically under

11  WLAD, Accommodations Two and Five would effectively sanction harassment in both

12  the employment and public accommodations context where a transgender colleague or

13  client's preferred "form of address" specifically includes *both* name and pronouns, rather

14  than name alone.  WAC 162-32-040(2)(d).  Although harassment must meet a high

15  threshold of pervasiveness to establish a hostile work environment claim, employers are

16  nonetheless obligated to take measures to curb harassing conduct that *could* incite a

17  hostile work environment—or else risk liability.  *See Vance*, 570 U.S. at 446; *Perry*, 98

18  P.3d at 1267-68; *see also Brown v. Alaska Airlines, Inc.*, No. C22-0668BJR, 2024 WL

19  2325058, at *11 (W.D. Wash. May 22, 2024) (citing *Bolden-Hardge*, 63 F.4th at 1225)

20  (rejecting failure-to-accommodate claim because an employer "has no obligation to wait

21  until religiously motivated discriminatory [and harassing] behavior rises to an actionable

22  level to take action to curb that behavior").  And because Washington endorses a "strict

1    liability" approach with respect to places of public accommodation, even one instance of

2    a staff member deliberately misusing a VCCC client's preferred form of address under

3    WAC 162-32-040 could render VCCC liable as a place of public accommodation.

4    *Floeting*, 434 P.3d at 45.  The record demonstrates that the potential for liability on this

5    ground was not illusory, as clients and staff had raised concerns about Ms. Trueblood

6    failing to use preferred pronouns.  (*See* Blenz Dep. at 28:15-25 (stating a trangender

7    colleague reported an instance of Ms. Trueblood misgendering them to Mr. Blenz);

8    Henson Dep. at 41:25-42:15 (stating "clients and colleagues had concern about pronouns

9    not being used"); *see also* Kelly Emails at 045 (noting that transgender staff were

10   "continuously offended").)[11]

11        Turning to Accommodation One, this request would involve Ms. Trueblood

12   offering not to work with clients who use preferred pronouns.  This practice would treat

13

14   ───────────────────

15        [11]  Ms. Trueblood lodges boilerplate hearsay objections to certain evidence of pronoun
     misuse.  (Pl. Reply at 6 (citing Def. Resp. at 14)); *see* Fed. R. Evid. 801(c)(2).  "If the contents of
     a document can be presented in a form that would be admissible at trial—for example, through
16   live testimony by the author of the document—the mere fact that the document itself might be
     excludable hearsay provides no basis for refusing to consider it on summary judgment."
17   *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 666 (9th Cir. 2021) (finding abuse of discretion,
     where district court sustained meritless hearsay objections at summary judgment, because "the
     objected-to documents either reflect the personal knowledge of individuals who could be called
18   to testify at trial or will likely be admissible at trial under exceptions to the hearsay rule"); *see
     also* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a
19   fact cannot be presented in a form that would be admissible in evidence.").  Here, there is no
     reason to doubt that the challenged evidence could be presented in admissible form at trial
20   through live testimony.  (*See* Henson Dep. at 42:11-15 (Ms. Henson testifying that she was
     "aware of" concerns from clients and colleagues "about pronuns not being used"); Blenz Dep. at
21   28:23-25 (Ms. Trueblood's attorney asking Mr. Blenz whether a transgender employee told him
     "about [Ms. Trueblood] misgendering [them]," and Mr. Blenz testifying affirmatively), 58:1-15
     (Mr. Blenz testifying that a transgender colleague "reported" a misgendering incident to Ms.
22   Williams).)

1    transgender clients differently and disadvantageously because the "offer" would not

2    extend to all clients; instead, it would target transgender clients solely on the basis of

3    gender identity.  (Pl. Dep. at 93:14-94-10.)  This, too, is discriminatory and therefore

4    accommodating this request would be an undue hardship for VCCC.  *See Peterson*, 358

5    F.3d at 607; *Suarez*, 552 P.3d at 800.  What is more, implementing Accommodation One

6    would require VCCC to:  (1) identify clients' preferred pronouns during the intake

7    process in order to proactively avoid pairing Ms. Trueblood with transgender clients; or

8    (2) permit Ms. Trueblood to, upon learning that a client uses preferred pronouns, either

9    suddenly begin using names only or cease working with the client entirely.  (Def. MSJ at

10   18-19; Pl. Dep. at 94:11-16, 95:9-96-3.)  Both options are discriminatory and would

11   invite potential liability under WLAD's public accommodations provisions.  The former

12   could result in harassment within the meaning of WLAD through "unwelcome personal

13   questions" about a clients' gender identity, WAC 162-32-040(2)(a), when the topic

14   would not otherwise arise in the intake process (*see* Pl. Dep. at 94:11-16).  The latter

15   would "alter" the clients' healthcare experiences and continuity of care.  WAC

16   162-32-040(3).  (*See* Doc. Prod. at 19.)  In the case at bar, the "single discriminatory act"

17   of removing M and C from Ms. Trueblood's caseload certainly altered the clients'

18   healthcare experiences based on their pronoun usage and gender identities, possibly in a

19   manner that could give rise to liability under WLAD.  *Floeting*, 434 P.3d at 43.

20        Put simply, VCCC could not grant the Disputed Accommodations without

21   discriminating against its transgender staff and clients, and without at least some danger

22   //

1   of liability under federal and state anti-discrimination law.[12]  This is sufficient to

2   establish undue hardship under long-standing Ninth Circuit precedent.  *See Peterson*, 358

3   F.3d at 607; *Bolden-Hardge*, 63 F.4th at 1225; *see also Suarez*, 552 P.3d at 800.  But

4   when considering the context of VCCC's particular business as *Groff* directs, the

5   hardship becomes even more acute.  *See Groff*, 600 U.S. at 468, 470.

6   VCCC is a behavioral healthcare provider that exists to treat vulnerable people

7   with complex mental health conditions and needs.  (Henson Decl. ¶¶ 2-4.)  VCCC's

8   clients include transgender youth who use preferred pronouns and struggle with intensive

9   behavioral health issues specifically related to gender dysphoria, gender identity, and

10  gender expression.  (*Id.* ¶ 12.)  VCCC also has transgender staff members who use

11  preferred pronouns.  (*Id.* ¶ 13.)  *See Groff*, 600 U.S. at 472 (holding "co-worker impacts"

12  are relevant to undue hardship where those impacts go on to affect the conduct of the

13  business).  Granting any of the Disputed Accommodations would have authorized

14  discrimination on the basis of gender identity in a manner that denies transgender

15  individuals "the authentic experience of who they are," which "is extremely detrimental

16

17  ---

[12]  *See, e.g.*, *Kluge*, 2024 WL 1885848, at *20-21 (concluding public school teacher's "Last Names Only" religious accommodation posed undue hardship by placing the school on the "razor's edge" of liability for sex discrimination under Title IX of the Education Amendments of 1972 (quoting *Matthews v. Wal-Mart Stores, Inc.*, 417 F. App'x 552, 554 (7th Cir. 2011))); *see also Bostock*, 590 U.S. at 732 (Alito, J., dissenting) ("After today's decision, plaintiffs may claim that the failure to use their preferred pronoun violates one of the federal laws prohibiting sex discrimination."); *Doe v. Arizona*, No. CV-18-00384-PHX-GMS, 2019 WL 2929953, at *2-3 (D. Ariz. July 8, 2019) (declining to summarily dismiss Title VII hostile work environment claim that was premised in part on supervisor's continuous misgendering of transgender employee); *Prescott v. Rady Childs.' Hospital-San Diego*, 265 F. Supp. 3d 1090, 1098-1100 (S.D. Cal. 2017) (denying motion to dismiss civil rights claims under the Affordable Care Act and California law that were premised on hospital staff's continuous misgendering of transgender youth patient).

to mental and behavioral health." (Blenz Dep. 61:8-12.) Accommodations that actively

harm VCCC's transgender clients and staff would wholly undermine VCCC's efforts to

provide "quality and recovery-oriented" gender-affirming care in pursuit of "healthy and

compassionate communities." (Manual at 403.) Put differently, requiring VCCC to

inflict the very harm it aims to remedy is nothing short of antithetical to VCCC's

"particular business" as a matter of common sense. *Groff*, 600 U.S. at 470-71; *see also*

*Kluge*, 2024 WL 1885848, at *17-20 (holding public school met *Groff* standard where

teacher's "Last Names Only" accommodation unduly burdened school's legitimate

mission to educate all students by "fostering a learning environment of respect and

affirmation" that is "equally open to all").

Ms. Trueblood argues VCCC cannot show undue hardship because it failed to

consider possible alternative accommodations. (*See* Pl. Resp. at 1, 7, 12.) To be sure,

*Groff* "requires that an employer reasonably accommodate an employee's practice of

religion, not merely that it assess the reasonableness of a particular possible

accommodation." 600 U.S. at 473 (instructing that "[c]onsideration of other options"

"would also be necessary" in a case like Groff's). Ms. Trueblood points to an email in

which Ms. Henson explains that pronoun usage "would need to be consistent in every

interaction" because otherwise, "it is discrimination on the basis of gender identity."

(Henson Email at 492.) Ms. Trueblood construes this statement as an "admission" by

VCCC that it could have allowed her "to completely omit all pronouns" and refer to

everyone using names only. (Pl. Resp. at 7.) But this alternative is unworkable because

it does not eliminate the risk of liability for harassment in deliberately failing to use a

1    transgender colleague or client's preferred "form of address."  WAC 162-32-040(2)(d).

2    Furthermore, this case is unlike *Groff* because Ms. Trueblood's religious beliefs could not

3    be easily accommodated by an alternative as obvious as "voluntary shift swapping."  600

4    U.S. at 473.  As indicated, swapping cases with other parent partners based on the client's

5    gender identity is discriminatory and, in any event, does not resolve the religious conflict

6    stemming from Ms. Trueblood's opposition to using transgender employees' preferred

7    pronouns.  (*See* Pl. Dep. at 96:4-21 (Ms. Trueblood acknowledging that she could not be

8    reassigned from staff meetings involving transgender co-workers); *see also* Pl. Resp. at 9

9    (Ms. Trueblood acknowledging that Accommodation One "may not have been a long

10   term workable solution").)  VCCC did at least search for alternatives by asking Ms.

11   Trueblood "if there were any other options to address the situation."  (Henson Decl.

12   ¶ 16.)  Because no other options were acceptable to Ms. Trueblood (*id.* ¶¶ 14, 16), the

13   parties were at an impasse with no mutual path forward.  Under these circumstances,

14   where only the Disputed Accommodations were acceptable to Ms. Trueblood, the court

15   concludes VCCC "carried its burden of showing that no reasonable accommodation was

16   possible."  *Peterson*, 358 F.3d at 608.

17          Ms. Trueblood also argues VCCC denied the Disputed Accommodations due to

18   religious animosity.  (Pl. MSJ at 23-25 (citing *Groff*, 600 U.S. at 472 ("If bias or hostility

19   to a religious practice or a religious accommodation provided a defense to a reasonable

20   accommodation claim, Title VII would be at war with itself.")).)  In particular, Ms.

21   Trueblood argues "[t]he employee handbook is devoid of information on Title VII

22   accommodations for religious adherents" yet it "contains information on accommodating

those with disabilities" and "five separate policies" reflecting protections for LGBTQ+ individuals.  (*Id.* at 24; *see* Pl. Reply at 8 ("Each decision maker showed animus towards Ms. Trueblood's religion in failing to account for her rights alongside rights of [LQBTQ+] staff.").)  VCCC, however, does maintain a standard protocol to address accommodation requests and it followed that protocol in Ms. Trueblood's case.  (Henson Decl. ¶ 10; Doc. Prod. at 21.)  This argument also deliberately overlooks the numerous provisions throughout VCCC's manual that prohibit workplace discrimination on the basis of religion.  (*See* Manual at 401, 404, 410, 423, 433.)  Accordingly, no reasonable juror could conclude that VCCC's employee manual evidences hostility to Ms. Trueblood's faith.  (*See generally id.  Cf.* Pl. Notes at 2 (Ms. Trueblood noting Ms. Williams "respected my religious beliefs"); Pl. Dep. at 182:16-19 (Ms. Trueblood testifying she felt VCCC was "inclusive" of her religious beliefs for ten years).)

Finally, Ms. Trueblood argues the Ninth Circuit has "never" decided undue hardship as a matter of law.  (Pl. Resp. at 3; *see* Pl. Reply at 2.)  This position is plainly incorrect because courts regularly determine undue hardship as a matter of law, as reflected in several cases that Ms. Trueblood herself cites.  (*See* Pl. MSJ at 8 (citing *Peterson*), 19 (citing *Bhatia*); Pl. Reply at 8 (citing *Berry*)); *Bhatia*, 734 F.2d at 1384 (affirming summary judgment in employer's favor based on undue hardship); *Peterson*, 358 F.3d at 601 (same); *Berry*, 447 F.3d at 645, 655 (same); *see also Brown*, 2024 WL 2325058, at *15-16, *26 (granting employer's motion for summary judgment based on undue hardship); *Petersen v. Snohomish Regional Fire & Rescue*, No. C22-1674TSZ, 2024 WL 278973, at *7-8 (W.D. Wash. Jan. 25, 2024) (same).

1    In sum, VCCC establishes its undue hardship defense as a matter of law.  Thus,

2    VCCC is entitled to summary judgment on Ms. Trueblood's failure-to-accommodate

3    claims under Title VII and WLAD.

4    **C.    Retaliation**

5    Title VII prohibits an employer from discriminating against an employee because

6    the employee "opposed any practice" proscribed by Title VII.  42 U.S.C. § 2000e-3(a);

7    *see also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56 (2006).  To evaluate

8    retaliation claims under Title VII, courts employ the burden-shifting framework

9    established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Kama v.*

10   *Mayorkas*, 107 F.4th 1054, 1058-59 (9th Cir. 2024).  Under that framework, the plaintiff

11   must first establish a *prima facie* case of retaliation by showing:  (1) she engaged in an

12   activity protected under Title VII; (2) her employer subjected her to an adverse

13   employment action; and (3) there was a causal link between the protected activity and the

14   adverse employment action.  *Id.* at 1059.  If the plaintiff establishes a *prima facie* case,

15   the burden then shifts to the employer "to articulate 'some legitimate, nondiscriminatory

16   reason for the challenged action.'"  *Id.* (quoting *Opara v. Yellen*, 57 F.4th 709, 723 (9th

17   Cir. 2023)).  "If such a reason is asserted, then the burden shifts back to the plaintiff to

18   show that the asserted reason is merely a pretext for retaliation."  *Id.*

19   The court first considers whether Ms. Trueblood has established a *prima facie* case

20   of retaliation under Title VII, then considers the balance of the *McDonnell Douglas*

21   burden-shifting framework.

22   *//*

1        1.   *Prima Facie* Case

2        Ms. Trueblood fails to establish two essential elements of her *prima facie* case of

3   retaliation:  protected activity and causation.[13]  First, although the Ninth Circuit has not

4   clarified whether requesting a religious accommodation constitutes protected activity,

5   Ms. Trueblood fails to persuade this court that it does.  "An employee engages in

6   protected activity when she opposes an employment practice that either violates Title VII

7   or that the employee reasonably believes violates that law."  *Westendorf v. W. Coast*

8   *Contractors of Nev., Inc.*, 712 F.3d 417, 422 (9th Cir. 2013); *see also* 42 U.S.C.

9   § 2000e-3(a).  As the Eighth Circuit has recognized, "merely requesting a religious

10  accommodation is not the same as opposing the allegedly unlawful denial of a religious

11  accommodation."  *EEOC v. N. Memorial Health Care*, 908 F.3d 1098, 1102 (8th Cir.

12  2018).  Ms. Trueblood did not "oppose" allegedly unlawful activity by initiating the

13  accommodations process.  *Westendorf*, 712 F.3d at 422.  In any event, the court rejects

14  Ms. Trueblood's attempt to significantly expand the scope of protected activity "[i]n the

15

16        [13]  Ms. Trueblood establishes an adverse employment action because her "termination plainly qualifies" as such.  *Lakeside-Scott v. Multnomah Cnty.*, 556 F.3d 797, 803 (9th Cir.

17  2009).  Her corrective action disciplinary notice, which threatened "[a]dditional disciplinary steps, up to and including termination," and eventually did result in termination, also constitutes

18  an adverse employment action.  (Corrective Action at 2); *see Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir. 2000) ("[A]n action is cognizable as an adverse employment action if it is

19  reasonably likely to deter employees from engaging in protected activity."); *Thomas v. Spencer*, 294 F. Supp. 3d 990, 999 (D. Haw. 2018) ("Under Ninth Circuit law, a letter of reprimand may

20  constitute an adverse employment action," but in making this determination "the court must consider whether there was any employment consequence as a result of the reprimand letter.").

21  The removal of two gender nonconforming youth clients from her caseload, however, does not constitute an adverse action because VCCC's decision to separate these clients from Ms.

22  Trueblood aligned with her proposed accommodation "[t]o offer to not work with clients who use preferred pronouns."  (Request at 471.)

1    absence of express statutory directive or authority on point," in accordance with at least

2    one other decision in this District.  *Brown*, 2024 WL 2325058, at *19 (Rothstein, J.)

3    (declining to construe a request for accommodation as protected activity).

4         Second, Ms. Trueblood fails to establish a causal link between her accommodation

5    request and an adverse employment action.  This element requires an employee to "show

6    that her protected conduct was a but-for cause—but not necessarily the only cause—of

7    her termination."  *Westendorf*, 712 F.3d at 422.  An employee can establish a casual link

8    through direct or circumstantial evidence from which causation can be inferred, such as

9    an employer's "'pattern of antagonism' following the protected conduct," *Porter v. Cal.*

10   *Dep't of Corr.*, 419 F.3d 885, 895 (9th Cir. 2005) (quoting *Kachmar v. SunGuard Data*

11   *Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997)), or the temporal proximity between the

12   protected activity and adverse action, *Villiarimo*, 281 F.3d at 1065.  *See Coghlan v. Am.*

13   *Seafoods Co.*, 413 F.3d 1090, 1095 (9th Cir. 2005) (explaining that direct evidence

14   proves animus without inference or presumption and typically consists of "clearly"

15   retaliatory statements or actions, whereas circumstantial evidence "requires an additional

16   inferential step" to demonstrate animus).

17        Here, Ms. Trueblood appears to argue she experienced a pattern of antagonism

18   because she "was continually pressured to recant her beliefs and to use preferred

19   pronouns."  (*See* Pl. MSJ at 25.)  Ms. Trueblood relies on a series of email threads in

20   which VCCC employees discuss her requested accommodations.  (*See id.*)  In one

21   internal email to Ms. Henson dated July 11, 2022, Ms. Kelly observed that "today [Ms.

22   Trueblood] misgendered frequently," that VCCC has "transgender[] staff who are

1  continuously offended," and then stated "I personally am saddened by [Ms. Trueblood's]

2  stance." (Kelly Emails at 483.)  This email merely corroborates VCCC's position that its

3  decision to discipline and terminate Ms. Trueblood was motivated by her continuous

4  misgendering of clients and staff, rather than her accommodation request.  And this email

5  does not evidence any attempt to antagonize or pressure Ms. Trueblood regarding her

6  religious beliefs, as Ms. Trueblood was not copied on the message.  (*See id.*)

7         Ms. Trueblood also cites email threads involving Ms. Henson and Ms. Boye as

8  evidence of causation.  (Pl. MSJ at 25 (citing Tribbett Decl. ¶ 11, Ex. 16 ("Henson

9  Thread"); *id.* ¶ 12, Ex. 17 ("Boye Check In")).)  In one internal email, Ms. Henson states

10 "I am hoping [Ms. Trueblood] changes her mind, however if she does not, we need to

11 prepare to sort out the logistics." (Henson Thread at 491.)  Again, Ms. Trueblood was

12 not copied on this message (*see id.*), which simply reflects that Ms. Henson maintained

13 some level of optimism that Ms. Trueblood's employment could continue.  In a different

14 email, Ms. Boye follows up with Ms. Trueblood "offer[ing] to check in" if she wanted

15 "to talk through" next steps after VCCC denied the Disputed Accommodations, unless

16 she had "already made a decision" about how to proceed.  (Boye Check In at 497-98.)

17 This email merely shows a supervisor making herself available to an employee to discuss

18 a difficult situation.  Even when viewing the facts in the light most favorable to Ms.

19 Trueblood, no reasonable juror could conclude from either of these messages that VCCC

20 antagonized Ms. Trueblood by "continually pressur[ing]" her to recant her religious

21 convictions.  (Pl. MSJ at 25.)  Accordingly, the court can adduce no "pattern of

22 antagonism" that would support a causal link in this case.  *Porter*, 419 F.3d at 895.

1        Ms. Trueblood also appears to argue that the temporal proximity between her

2   accommodation request and her disciplinary meeting and termination evidences

3   causation.  (Pl. MSJ at 25-26 (arguing Ms. Trueblood "was given a corrective action

4   disciplinary notice" just "[o]ne day after her request for accommodation," and that this

5   request ultimately "prompted her termination" a few weeks later).)  This "inquiry is

6   fact-specific and depends on both the degree of proximity and what, if any, other

7   evidence supports an inference of" retaliatory motive.  *Kama*, 107 F.4th at 1059-60.

8   "Even cases involving very close temporal proximity have generally featured

9   independent evidence of discrimination or retaliation."  *Id.* at 1060 (collecting cases).

10  "When there are equally likely causes of [a] [p]laintiff's termination that arise during the

11  same period, temporal proximity does not establish" a retaliatory motive.  *Id.* at 1061-62

12  (rejecting temporal proximity argument that "cut[] both ways" because there "was also a

13  close temporal link between Plaintiff's noncooperation (the stated reason for the

14  termination of his employment) and the [employer]'s adverse action").

15       Temporal proximity does not aid in establishing a causal link in this case.  Ms.

16  Trueblood initially requested her accommodations by email on June 29, 2022, after

17  business hours at 7:17 P.M.  (Request at 471.)  The undisputed facts demonstrate Ms.

18  Trueblood knew at the time she sent this email that VCCC had already scheduled her

19  corrective action meeting to take place the following day.  (Pl. Dep. 71:6-16; *see*

20  Corrective Action at 1 (dated June 30, 2022).)  In fact, Ms. Trueblood requested

21  accommodations *because of* the imminent corrective action meeting.  (*See* Pl. Notes at 3

22  ("I knew the Corrective Action meeting was the next day, so I sent a request for religious

1    accommodations to HR.").)  Under these circumstances, Ms. Trueblood cannot

2    reasonably argue a "[o]ne-day" span between her accommodation request and

3    disciplinary notice demonstrates that the former caused the latter.  (Pl. MSJ at 25.)

4           Furthermore, the approximate two-and-a-half-week span between Ms. Trueblood's

5    accommodation request and termination does not show a causal link under the

6    circumstances, where she offers no other evidence of retaliation.  *See Kama*, 107 F.4th at

7    1060.  Although this time period is short, Ms. Trueblood's temporal proximity argument

8    "cuts both ways" because there is also a close temporal link between her misconduct and

9    her termination.  *Id*.  Indeed, in the months, weeks, and days leading up to her

10   termination, Ms. Trueblood consistently failed to follow her supervisors' instructions

11   regarding the Pronoun Protocol (*see, e.g.*, Corrective Action at 1); deliberately

12   misgendered at least one youth client,[14] in violation of VCCC's Staff Principles and

13   Cultural Competence Standards (*see* Staff Principles (requiring staff to "[r]espect client

14   needs and preferences"); CCS Policy at 1 (requiring staff to coordinate family-oriented

15   care plans "with client's consent"); *see also* Pl. Dep. at 51:15-18, 68:16-22 (Ms.

16   Trueblood acknowledging that misuse of preferred pronouns can be harmful and

17   _____

18   [14]  Throughout her briefing, Ms. Trueblood denies that she ever deliberately used
     incorrect pronouns.  (*E.g.*, Pl. Resp. at 1.)  VCCC asserts Ms. Trueblood's view of the facts "is
     demonstrably false."  (Def. MSJ at 2.)  "When opposing parties tell two different stories, one of
19   which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court
     should not adopt that version of the facts for purposes of ruling on a motion for summary
20   judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  The court agrees with VCCC that the
     record blatantly contradicts Ms. Trueblood's position, at least as to youth client M.  (*See* Pl. Dep.
21   at 59:18-61:5, 64:13-17 (Ms. Trueblood testifying that it was her idea to "only call M by the
     assigned or biological pronouns" and she made the "conscious choice" to do so, despite knowing
     that "M wanted to use they/them pronouns"); Pl. Notes at 3 (Ms. Trueblood stating it was her
22   "intention" to use the pronouns M "was assigned at birth").)

1    disrespectful)); and ultimately refused to commit to providing non-discriminatory

2    services and treating all clients and staff equally, as required by VCCC's Compliance and

3    Ethics Policy (*see* C&E Policy at 1) and the law (*see supra* § III(B)(2)(c)).  Evidence of

4    temporal proximity equally supports VCCC's stated reasons for terminating Ms.

5    Trueblood (*see* Termination Letter at 500), and thus does not independently establish

6    causation.  *Kama*, 107 F.4th at 1061; *see Unt v. Aerospace Corp.*, 765 F.2d 1440, 1446

7    (9th Cir. 1985) ("An employee is not protected by Title VII when he violates legitimate

8    company rules, knowingly disobeys company orders, disrupts the work environment of

9    his employer, or willfully interferes with the attainment of the employer's goals.").

10          Accordingly, Ms. Trueblood neither establishes nor creates a triable issue as to her

11   *prima facie* case of retaliation.

12          2.  <u>Nondiscriminatory Justification and Pretext</u>

13          Even if Ms. Trueblood could establish a *prima facie* case of retaliation, her claim

14   still fails under the remaining steps of the *McDonnell Douglas* burden-shifting

15   framework.  As noted, if a plaintiff meets her initial burden under *McDonnell Douglas,*

16   the employer must then offer a legitimate, nondiscriminatory reason for the adverse

17   employment action.  *Kama*, 107 F.4th at 1059.  If the employer does so, the burden shifts

18   back to the plaintiff to demonstrate pretext.  *Id.*  A plaintiff can establish pretext either

19   "directly, by showing that unlawful discrimination more likely [than not] motivated the

20   employer," or "indirectly, by showing that the employer's proferred explanation is

21   unworthy of credence because it is internally inconsistent or otherwise not believable."

22   *Id.* (quoting *Opara*, 57 F.4th at 723).  "When assessing the validity of an employer's

1   stated reason for its actions, the key is not whether the reason is 'objectively false' or

2   'baseless' but whether the employer 'honestly believed its reasons for its actions.'"

3   *Kama*, 107 F.4th at 1059 (quoting *Villarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054,

4   1063 (9th Cir. 2002)).

5        Here, VCCC offers legitimate, nondiscriminatory reasons for Ms. Trueblood's

6   disciplinary notice and termination:  to enforce its anti-discrimination policies, to avoid

7   violating the law, and to "protect its vulnerable LGBTQ clients and also its staff

8   members, both preventing a hostile work environment and supporting LGBTQ rights."

9   (Def. MSJ at 22.)  The record amply supports VCCC's position, and "[c]ourts have

10  repeatedly acknowledged that this is a legitimate, nondiscriminatory justification for an

11  employer's actions."  *Brown*, 2024 WL 2325058, at *13 (citing *Peterson*, 358 F.3d at 603

12  ("[E]fforts to eradicate discrimination against [LGBTQ individuals] in [the] workplace

13  [are] entirely consistent with the goals and objectives of our civil rights statutes

14  generally.")); *id.* at *19.  VCCC's articulation of legitimate bases for its actions shifts the

15  burden to Ms. Trueblood to show pretext, which she fails to do.

16       The court begins its assessment of pretext by noting that Ms. Trueblood does not

17  identify or otherwise acknowledge the *McDonnell Douglas* burden-shifting framework in

18  her summary judgment motion.  (*See* Pl. MSJ at 25-26 (Ms. Trueblood beginning and

19  ending her analysis of retaliation with the *prima facie* elements of that claim).)  As a

20  result, she neglects to address pretext at any point until her reply brief (*see* Pl. Reply at

21  12-13; *see generally* Pl. MSJ; Pl. Resp.), which ordinarily would result in waiver, *Turtle*

22  *Island Restoration Network v. U.S. Dep't of Com.*, 672 F.3d 1160, 1166 n.8 (9th Cir.

1  2012).  Ms. Trueblood explains she declined to discuss pretext in her motion because in

2  her view, "the entirety of the failure to accommodate framework addresses [the

3  *McDonnell Douglas*] test."  (Pl. Reply at 12-13.)  She then proceeds to argue her

4  "termination was pretextual because no *per se* violation of the law had or would occur by

5  using first names and omitting pronouns," and any misuse of pronouns was not

6  harassment because it was unintentional.  (*Id.* at 13.)  Even if the court were to accept

7  Ms. Trueblood's explanation and reach her untimely argument as to pretext, she

8  misunderstands the relevant standard.  All that matters is whether VCCC "honestly

9  believed its reasons for its actions"—not whether those reasons ultimately prove lawful.

10  *Kama*, 107 F.4th at 1059 (quoting *Villarimo*, 281 F.3d at 1063).  On this record, even

11  when viewing the facts in the light most favorable to Ms. Trueblood, VCCC easily meets

12  that standard.  No reasonable juror could conclude otherwise.

13        In sum, VCCC is entitled to summary judgment on Ms. Trueblood's Title VII

14  retaliation claim.

15                    **IV.   CONCLUSION**

16        For the foregoing reasons, the court DISMISSES the Doe Defendants (*see supra* at

17  18 n.8), DENIES Ms. Trueblood's motion for partial summary judgment (Dkt. # 16), and

18  GRANTS VCCC's motion for summary judgment (Dkt. # 19).  Ms. Trueblood's claims,

19  and this action, are DISMISSED with prejudice.

20        Dated this 28th day of August, 2024.

21

22  JAMES L. ROBART
    United States District Judge